**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| MARY RHONDA SROFE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 2:06-cv-01696-JEO |
| | ) | |
| WILSON TRUCKING CORP., | ) | |
| | ) | |
| Defendant. | ) | |

## <u>MEMORANDUM OPINION</u>

Plaintiff Mary Rhonda Srofe ("Srofe" or "the plaintiff") has filed a complaint against

Wilson Trucking Corporation ("Wilson" or "the defendant") asserting she was improperly

retaliated against under Title VII[1] and the Age Discrimination in Employment Act ("ADEA").[2]

(Complaint).[3]  She also asserts state law claims of negligent retention, supervision, and training.

*Id*.  The matter is presently before the court on the motion for summary judgment filed by the

defendant.  (Doc. 19).  The motion is supported by a memorandum ("Def. Mem.")[4] and various

exhibits (doc. 21).[5]  The plaintiff has filed a response in opposition to the motion ("Pl. Res.

Opp.")[6] and various exhibits (doc. 24 & 25).[7]  The defendant filed a reply to the plaintiff's

---

[1] 42 U.S.C. § 2000e, et seq.

[2] 29 U.S.C. §§ 621 et seq.

[3] The complaint is located at document 1 in the court's file.

[4] The defendant's memorandum is located at document 20.

[5] The defendant's exhibits will be referred to herein as "Def. Ex. __."

[6] The plaintiff's response in opposition to the motion is located at document 23.

[7] The plaintiff's exhibits will be referred to herein as "Pl. Ex. __."

response ("Def. Reply")[8] and a few additional exhibits (doc. 28).  Upon consideration of the record and the arguments of counsel, the court finds that the motion for summary judgment is due to be granted.

## I.      FACTS[9]

The defendant operates a "less than truck load" freight transportation business with several facilities throughout the Southeastern and mid-Atlantic United States, including a facility in Birmingham, Alabama.  (Donald Maguire Deposition ("Maguire Dep.") at pp. 28-29).[10]  The plaintiff was rehired as an account executive in the defendant's Birmingham terminal on August 30, 2004.  (Mary Rhonda Srofe Deposition ("Srofe Dep.") at p. 38).[11]  The plaintiff had two direct supervisors during her employment with Wilson, the Birmingham terminal manager and the regional director of sales.  (Keith Murgatroyd Deposition ("Murgatroyd Dep.") at p. 28).[12]  On December 6, 2004, Donald Maguire ("Maguire")[13] was hired as the regional director of sales for the plaintiff's region.  (Maguire Dep. at p. 72).  Christian White ("White") was the Birmingham terminal manager at the commencement of the plaintiff's employment and was subsequently replaced by Keith Murgatroyd ("Murgatroyd") in May 2005.  (Frank James Bailey

---

[8]The defendant's reply is located at document 27.

[9]The facts set out below are gleaned from the parties' submissions and are viewed in a light most favorable to the plaintiff.  They are the "facts" for summary judgment purposes only.  They may not be the actual facts.  *See Cox v. Administrator U.S. Steel & Carnegie*, 17 F.3d 1386, 1400 (11th Cir. 1994); *Underwood v. Life Insurance Co. of Georgia*, 14 F. Supp. 2d 1266, 1267 n.1 (N.D. Ala. 1998).

[10]Maguire's deposition is located at Pl. Ex. B.

[11]Srofe's deposition is located at Pl. Ex. A.

[12]Murgatroyd's deposition is located at Pl. Ex. C.

[13]Maguire is incorrectly identified as "McGwire" in the plaintiff's complaint.

Declaration ("Bailey Declaration") at ¶ 4).[14]

Maguire, as the new regional director of sales, required his account executives to complete a weekly sales summary form in an effort to assist and track the performance of the account executives under his supervision. (Srofe Dep. at pp. 50, 69; Maguire Declaration ("Maguire Dec.") at ¶ 3).[15] Sending the weekly sales report was not a company-wide policy. (David Collier Deposition ("Collier Dep.") at pp. 28-29).[16] However, the plaintiff acknowledges that completing the sales summaries was a part of her job duties. (Srofe Dep. at pp. 300-02).

Maguire traveled to Birmingham and accompanied the plaintiff on her sales calls in January 2005 in an effort to get to know her, review her sales abilities, and ascertain her needs so there could be growth in the territory. (Maguire Dec. at ¶¶ 4-5; Srofe Dep. at p. 447). While they were together and waiting to see a customer, Maguire asked the plaintiff to guess his age. (Plaintiff's Interview at p. 1).[17] She told him that "she was not good at guessing people's age and preferred not to try." *Id*. Maguire "kept at her, she kept refusing until he became aggravated that she would not guess." *Id*. Maguire "then told her his age stating that he look[ed] younger than he was." *Id*. "Srofe felt that the entire conversation was unprofessional and his aggravation [was] unwarranted." *Id*. On the same day, Maguire also made a comment about the plaintiff being "seasoned." (Srofe Dep. at pp. 439-40, 447-48).

Maguire monitored the plaintiff's activities over the next four months and noted that there

---

[14]Bailey's declaration is located at Def. Ex. D.

[15]Maguire's declaration is located at Def. Ex. G.

[16]Collier's deposition is located at Def. Ex. E.

[17]The plaintiff's interview is located at Pl. Ex. H.

were some initial problems with the plaintiff submitting her sales reports as well as room for improvement with regard to her sales efforts and productivity. (Maguire Dec. at ¶ 5). She had her 2005 performance review on April 28, 2005. (Plaintiff's Performance Review ).[18] Overall, she was rated as average. In the review section concerning areas where improvement was necessary, Maguire wrote, "A review of your personnel file does not indicate any specific area in which improvement is required. However, I encourage your continual focus on increasing your average daily shippers as well as your territory density. Also effort needs to be placed in developing our current customers and increasing our $2000.00+ month accounts." *Id*. at p. 2. Additionally, Maguire noted in the review that she (Srofe) had "quickly become a valuable asset to the Birmingham terminal and Wilson Trucking." *Id*.

On or about May 20, 2005, Maguire made another trip to Birmingham where he met with the plaintiff, White, and Murgatroyd. (Maguire Dec. at ¶ 6; Srofe Dep. at p. 302). The purpose of the May meeting was to discuss sales activity for the entire Birmingham terminal and the plaintiff's failure to submit her weekly sales summary reports as required by Maguire. (Maguire Dec. at ¶ 6). Maguire declares that the plaintiff "failed to submit her sales summary reports for at least four or five weeks prior to the May 20 meeting." *Id*.[19]

After the May 20 meeting, the plaintiff turned in some but not all of her weekly sales reports. (Murgatroyd Dep. at p. 110). The plaintiff submitted weekly sales reports for the weeks

---

[18]The plaintiff's performance review is located at Pl. Ex. FF.

[19]The plaintiff does not dispute that she failed to turn in the missing sales reports but instead claims computer problems were the cause of the missing reports. Further, the plaintiff disputes any reference that she was fired for failure to turn in her weekly sales reports. (See Pl. Res. Opp. at p. 3, n. 6).

ending May 27, June 3, June 18, July 25, and July 31.  (Doc. 24 at Ex. S-W).[20]

On July 25, 2005, Maguire instructed Murgatroyd to issue the plaintiff a verbal warning because she had neglected her job duties by failing to do all her weekly sales summaries. (Murgatroyd Dep. at p. 106; Maguire Declaration at ¶ 8).  Murgatroyd documented the verbal warning in writing which the plaintiff acknowledged, dated, and initialed on July 27, 2005. (Srofe Dep. at pp. 369-71; Murgatroyd Dep. at pp. 106-08).  On July 26, 2005, the plaintiff e-mailed Maguire a missing sales summary and stated that she would "catch up on the ones I'm behind and e-mail [them] upon completion."  (Srofe Dep. at pp. 359-60, 372; Def. Ex. M).  The plaintiff did not indicate more specifically when she would send the missing sales reports.  (Def. Ex. M).

On July 28, 2005, Maguire sent an e-mail to the plaintiff with regard to the missing sales summaries.  (Pl. Ex. X at pp. 2-3).[21]  On July 29, 2005, the plaintiff sent a reply e-mail to Maguire in which she listed various reasons why her sales reports had been late or missing.  *Id.* In this e-mail, the plaintiff complained of computer problems and the fact that she was "virtually the only sales rep in" Birmingham.  She also noted that she was upset with the verbal warning she had been given.[22]  (*Id.*; Pl. Ex. H).  The plaintiff did have computer problems during her

---

[20]In her response, the plaintiff cites different dates for the sales reports.  However, the record reflects that sales summaries were turned in for the dates listed above.  The differences are not significant in the court's evaluation of the plaintiff's claims and the pending motion.

[21]The e-mail from Maguire specifically states "Rhonda, When am I going to receive the missing reports?  Also, considering we had the same problem and spoke about this during our meeting on May 20th, why has this occurred again?  I would appreciate your weekly compliance to this requirement.  Thanks, Don."  *Id.*

[22]The plaintiff's e-mail response was as follows:

I am only one person.  If you could consider & recognize the fact that I have been virtually the only sales rep in the Bhm terminal.  During my entire tenured [sic] at Wilson Trucking.  I have worked both my territory and the other territory to the best of my ability.  As for the status of the sales reports, Don, do you realize that I am currently having to bill all outbound shipments from NTA Graphics in Bhm.  I bill each invoice per his

employment.[23]  (Pl. Ex. H & Y; Collier Dep. at pp. 72-73).  Maguire felt that the plaintiff's

requirements, when all billing is completed.  I e-mail each invoice to Rodney @ NTA for his inspection.  I also e-mail invoices to Teresa Stratton in the FIS billing dept.  I attempt to print copies of each bill for both our terminal/cust file & for the customer.  This can be a very time consuming task as I use an old cannon black & white printer I have had to provide from home.  The BHM sales office does not have a working printer.  There was a printer of some sort in the other sales office, however, it is not compatible with either sales computers [sic].  I then match all the specific B/L #'s to correct invoices that reflect these same numbers.  I then prepare to deliver to Rodney @ NTA Graphics on Thur or Friday, usually at his request.  In addition to billing I have a regular mvmt [sic] report I pull once or twice a week, so he can monitor our service on a weekly basis.  In addition to NTA's billing, I receive several phone calls daily, Re: billing, service, and or damage.  I also take at least 2 calls per day from other customers with issues, most of these calls require a [sic] additional 3-4 outgoing phone calls from me to the customer, delivering terminals, T.M.'s and usually a call to enlist Jeff's help in getting frt dlvd on time, this is not including the initial call the customer had to place to me.  Normally, I make at least 7-10 sales calls per day.  I have had to make more than the average number of maintenance calls on existing accounts that are very unhappy with our recent service.  (June is when I really noticed a decline in our on time service).  I have tried to be pro active in handling these accounts rather than reactive, which could ultimately result in the loss of business.  I have also worked on the account code lists that you sent to each of us.

I have not listed all my normal job duties.  So, I hope at this point you might possibly have some insight as to why I'm upset w/the warning I was given.  Also understand that most people that have prided themselves through the years w/great work ethic, & above average performance would be equally upset if they received written notification stating you are not doing your job & attacking my work ethic.  The paper that I was given, indicated that I was doing a poor job.  It basically said that I have a poor, not acceptable work performance.  I guess I can tell you at this point I do not agree with the comments on my verbal warning or written warning.  I am still very confused as to whether this is a true verbal, which I was told does not require employee's signature or date.  I was also told that if I was asked to sign or initial & date that it would serve as a written warning.  However, this was my first offense and it was presented to me in writing & I was required to initial and date a form that does read verbal warning.  I am very confused as to what type of repremand [sic] I have been given, verbal or written?  Sale reports were also listed as unexceptable [sic].  All this being said, I still do not understand why you would go out of your way or how you would deem it necessary to once again reprimand me thru your attached e-mail.  You are well aware of the verbal action that was taken against me on WED, 7/27/05.  2 days ago.  I initialed & dated the form & made you a copy, that was sent via trk mail to your attention.  Also, you posed another question re: Why I have had this computer problem again?  This was also addressed in the write up I was issued on WED, 7/27/05.  You have put a permanent piece of paper in my employee folder which plainly states my alledged [sic] negligence.  I signed/initialted [sic] with out [sic] any comments, because I thought it was over.  Obviously, I am wrong about this as well.  Allow me to address the other question you had regarding my computer.  My computer was broken twice & sent to FIS for repairs.  The 2nd time you instructed me to send my computer & the old sales computer to FIS for swap, you told me that the computer room would download all my current information onto the other sales computer, no problem.  My new computer finally made it back 2 wks later.  I realized at that time, some items were missing and icons were in folders rather than displayed as they were on my original computer.  I realize [sic] right away that I had lost some of my info/docu/folders.  e-mails. [sic] Although, I did manage to retain several of Toms [sic] old folders containing personal & sales related info.  I also have a former sales rep's, Julie Daily's mileage/expense reports along with personal pictures of her family on this computer, Julie resigned her position at Wilson almost 2 yrs ago.  It is unfortunate that I have to worry when I report computer problems although this computer has had several legitimate problems & continues to act up tonight.  My husband is very literate in computers.  He can not understand why it begins highlighting portions of a paragraph or a sentence and changes the sentence format or scrambles words at random.

(Pl. Ex. X).

[23]The defendant disputes the plaintiff's assertion that she was having computer problems (see Def. Reply at pp. 4-5, n.12-14 and p. 6, n.17), however, the court must construe the evidence at this juncture in a light most favorable to the plaintiff as the non-moving party.  Additionally, it is disputed as to what access to her computer the plaintiff needed to complete the weekly sales reports.  (Compare Pl. Res. Opp., "Additional Undisputed Facts" at ¶ 18 and Def. Reply at p. 5, n. 16.)  Whether or not the

responsive e-mail was "blistering" and "insubordinate."  (Pl. Ex. X; Maguire Dec. at ¶ 9).

Maguire did not reply to the e-mail.  (Maguire Dec. at ¶ 9).

On August 3, 2005, the plaintiff prepared a letter complaint to Jim Bailey ("Bailey"), the

Vice-president of Safety and Human Resources, alleging harassment involving Maguire.  It was

submitted on August 6, 2005.  (Pl. Ex. P at p. 1).  Therein, she stated, Maguire "made several

defamatory comments directly to me and to other Wilson employees about my work ethic and my

competence as a professional sales representative."  *Id.*  The plaintiff also contended that

Maguire made an "especially offensive comment ... regarding [her] age" and "continuously

pressured [her] to guess his age."  *Id.*  The plaintiff felt the comments were offensive.  (Pl. Ex.

H).  She also stated that the purpose of the letter was to advise Bailey that she believed Maguire

was "unjustly discriminat[ory] and harassing [her] based on the fact that [she was] an articulate,

female sales professional who has a proven history of sales success and performance."[24]  (Pl. Ex.

P at p. 1).  She also complained about being given the July 27, 2005, verbal warning for not

getting her sales reports in as agreed and about the July 28, 2005, e-mail from Maguire asking

when he could expect to receive the missing sales summaries.[25]  (Pl. Ex. H).

After receiving the plaintiff's letter complaint, Bailey directed Patricia Dwiggins

("Dwiggins"), who is a regional human resources field specialist, go immediately to Birmingham

to investigate the matter.  Dwiggins arrived at the Birmingham terminal within two days and

conducted the investigation with commensurate interviews.  (Bailey Dec. at  ¶ 7).

---

computer problems were the ultimate reason why the plaintiff failed to submit her sales reports, therefore, is in dispute.

[24]As will be discussed below, there is no other evidence of gender discrimination other than the plaintiff's thoughts or speculation.

[25]The plaintiff considered the July 28, 2005 e-mail another reprimand.  (Pl. Ex. H at p. 2).

Dwiggins interviewed the plaintiff on August 9, 2005. Srofe complained that Maguire made her feel uncomfortable by making age related comments during the meeting they had in Birmingham in January 2005. (Pl. Interview (Pl. Ex. H) at p. 1). The plaintiff specifically stated that "Maguire told her she was 'seasoned' and made comments about age" during the sales call. *Id*. In addition, Maguire made comments in which he asked the plaintiff to guess his age. *Id*. Further, she stated that Maguire's reference to her being "seasoned" meant that she was "older." (*Id*.; Srofe Dep. at pp. 391, 448).

Dwiggins immediately provided the results of the investigation to Bailey. (Bailey Dec. at ¶ 7). Bailey determined "there was no merit to the plaintiff's claim of unlawful gender and age discrimination." *Id*. On August 19, 2005, Bailey composed a letter to the plaintiff informing her of his decision. (Pl. Ex. R). In his letter, Bailey "assure[d] [the plaintiff] that [she would] not be subject to any form of retaliation or discipline as a result of the investigation" since senior management was of the opinion "that [she] believed that [she was] making a good faith complaint of harassment." *Id*.

In August 2005, the plaintiff did not turn in any of the missing or late sales reports or inform anyone of a time when she would submit the reports. (Maguire Dec. at ¶ 10). The plaintiff asserted various reasons for not filing the missing reports in August. (Pl. Ex. H at p. 3; Pl. Ex. JJ; Pl. Ex. NN). These reasons included: she "was absent from work for some time in August (Pl. Ex. JJ; Pl. Ex. NN); "[s]he has never been given the opportunity to do the reports, she was told to make sales calls" (Pl. Ex. H at p. 3); and, she was told by Murgatroyd "not to worry about the reports, just to get better from now, so she has not gone back and done them." *Id*.

Maguire did not have any direct contact with the plaintiff after she made her complaint about him on August 6, 2005.  (Srofe Dep. at pp. 394-95, 403-04).  The plaintiff does not recall any specific "contact or interaction with Don Maguire" from August 5, 2005, until her termination.  *Id*. at pp. 403-04.  However, the plaintiff claims that Maguire's "actions by not being available and not returning [] [her] call" and the fact that she was unable to "reach [] [Maguire] at all" were a negative response to her July 29, 2005 e-mail.  *Id*. at pp. 394-95.  In addition, the plaintiff claims that Maguire "turned Jim Bailey and David Collier[, the Vice-president of Sales and Marketing,] against her."  (Pl. Res. Opp. at p. 4, n.10).

Sometime after the plaintiff filed her complaint with Bailey, Maguire contacted Bailey and Collier, to ask if he (Maguire) could still ask the plaintiff for the missing sales summaries. (Maguire Dec. ¶ 10; Bailey Dec. ¶ 8; Collier Dec. ¶ 4).  On August 22, 2005, Collier sent an e-mail to Maguire in which he asked Maguire to "coach" Murgatroyd on how to approach the plaintiff.  (Pl. Ex. Z).[26]  Further, Collier asked that Murgatroyd communicate with Srofe about the missing sales reports and tell her that "IF the reports were not sent in by the date SHE suggested, then a second disciplinary action should be issued."  *Id*. (emphasis in original).

On August 26, 2005, the plaintiff complained to Kim Moneymaker in the computer section "about computer problems . . . because her e-mails were being deleted and her computer 'stalls and freezes.'"[27] (Pl. Ex. AA).  The computer was sent by her to Moneymaker.

On August 31, 2005, Collier sent an e-mail to Bailey and Maguire to review Srofe's 2005

---

[26]The e-mail from Collier states Maguire should "[h]ave Keith [Murgatroyd] communicate" the information regarding the missing sales reports to the plaintiff.  (Pl. Ex Z).

[27]Premised on the content of the e-mail, it is apparent that this was the second complaint by the plaintiff to Moneymaker concerning the computer.

performance appraisal.  (Pl. Ex. BB).  Bailey testified that reviewing the plaintiff's performance

appraisal is not one of his regular job duties.  (Bailey Dep. at pp. 99-100).

When Maguire did not have all the sales summaries by the end of August, he contacted

Bailey and Collier about what to do.  (Maguire Dec. at ¶ 10).  Collier told him to contact

Murgatroyd so that he could request the missing summaries from the plaintiff.  *Id*.  Collier also

suggested in an e-mail on August 22, 2005, that Murgatroyd (1) tell Srofe that the information is

necessary, (2) the reports are necessary, even if late, (3) ask her when she can complete the

reports, (4) hold Srofe to the "agreed upon" date, (5) say nothing else, and (6) issue a second

disciplinary action if the reports are not sent in as agreed.  (Pl. Ex. Z).  The suggested steps were

approved by Bailey.  (Bailey Dec. at ¶ 8).

Around the end of August 2005, about the one-year anniversary of her hire date, Collier

sent the plaintiff a card thanking her for her loyalty.  (Pl. Ex. Q).

On September 2, 2005, Bailey and Collier instructed Murgatroyd to request the missing

sales summaries from the plaintiff.  (Bailey Dec. at ¶ 8; Collier Dec. at p. 3).  First thing on

September 2, 2005, the plaintiff went to Murgatroyd's office to inquire about her computer.

Murgatroyd asked her when he could expect the missing sales reports.  (Srofe Dep. at pp. 407-

08.)  Murgatroyd claims that in response to his request for the missing sales reports, the plaintiff

stated "that she was not going to do them; she couldn't recall what she did back then."

(Murgatroyd Dec. at ¶ 4; Bailey Dec. at ¶ 4).  According to Murgatroyd, "the plaintiff was loud,

disrespectful, used profanity towards him, was insubordinate and directly refused to provide the

missing sales summaries."  (Murgatroyd Dec. at ¶ 4).  Srofe's recall of this conversation is quite

different.  (Srofe Dep. at p. 411).  She states that she did not raise her voice to Murgatroyd until

after she was terminated later in the day, she was not disrespectful, and she did not use profanity. (Srofe Dep. at pp. 412, 414 & 420). She does acknowledge that she said it was "humanly impossible" to do the sales reports without a computer. *Id.* at p. 420. She told Murgatroyd that she wanted her computer to see if it was working. *Id*. at p. 408. She then left Murgatroyd's office and went to her office to type an e-mail. *Id*. at p. 412. She was there at least one hour. *Id*. at p. 413. Srofe stated that her computer would not work properly, other than allowing her to type e-mails. *Id*. at p. 419.

Srofe had a scheduled sales appointment later in the day. According to Srofe, Murgatroyd would not let her leave to make the call. *Id*. at p. 418.

Carolyn Williams ("Williams"), a Wilson employee at the Birmingham terminal, overhead two conversations between the plaintiff and Murgatroyd on September 2, 2005; one in the morning and one in the afternoon. (Deposition of Carolyn Williams ("Williams Dep.") at 46-47).[28] Williams stated that in the first conversation, Murgatroyd asked the plaintiff for the sales reports to which the plaintiff responded that she could not do the reports because her computer was not working. Williams also stated that Srofe "got very irate in that conversation, got very upset" and stated "[h]ell, I can't do [the reports]." *Id*. at pp. 47-48. Williams did not hear the plaintiff say any curse words other than "hell" in the first conversation. *Id*. at p. 48.

At 10:02 a.m. on the same day, Srofe sent an e-mail to Donna Kania at the corporate office concerning outstanding "fuel tickets." It stated:

> I am resending the original message I sent to you on 8/3/05. My computer has not been working properly for a few months. They finally allowed me to send my computer to Kim Moneymaker last Friday. I had lost all sent e-mails and

---

[28]William's deposition is located at Pl. Ex. G.

customer files were purged.  I received my computer back this a.m. Keith said you
that [sic] you were upset sand had no record of initial e-mail.  I was able to
retrieve this information[29] ]for you.  Please see attached.

(Pl. Ex. CC).

At some point after this initial meeting, the plaintiff authored an e-mail to Collier.  In it,

she details the various problems with her computer and her efforts to resolve the same.  (Pl. Ex.

I).  Her e-mail concluded:

It is apparent, that I once again I'm [sic] being harassed.  I was told I would not
suffer any repercussions from the formal complaint I filed with Wilsons [sic]
Human Resource Dept.  This definitely is not reasonable.  Please inform me as to
what I should do with this computer. . . .  I am only asking for the same
opportunities afforded to other sales reps.

*Id*.  The e-mail, however, was not transmitted until after the plaintiff was terminated.  *Id*.;

Murgatroyd Dep. at pp. 221-24.

There is a dispute as to what Murgatroyd did after his conversation with Srofe on the day

of her termination.  In his deposition, Murgatroyd first says that after his conversation with Srofe,

he "reported [(via e-mail)] to Don [Maguire] and Jeffrey [Saunders, the Regional Director of

Operations] – there might have been somebody else, too – what was told to me."  (Murgatroyd

Dep. at p. 129).  Then Murgatroyd says he "might have called Jeffrey [Saunders] . . . I did not

call Don [Maguire]."  *Id*. at p. 129.  Finally, Murgatroyd remembers a telephone conversation he

had with [Jim] Bailey prior to sending out the e-mail.  *Id*. at p. 131.  In addition, "Bailey had told

Murgatroyd to document what was said and send an e-mail to document what was discussed."

*Id*. at p. 131-32.  When Murgatroyd sent this e-mail to Maguire, Saunders, and Bailey discussing

the conversation with Srofe, he stated that she told him that it was "[h]umanly impossible for her

---

[29]The defendant notes that the requested information regarding mileage receipts was "hard copy" information (receipts) that originally was to be sent to be "truck mail."  (Def. Reply at p. 7, n.23.)

to get her past weekly sales summaries caught up.  I approached her today again, and asked her about her sales summaries, she got extremely irate, and started raising her voice and getting very offensive."  (Pl. Ex. O).  Murgatroyd did not reference the terms "foul language" or any profanity in the e-mail.[30]  (Murgatroyd Dep. at pp. 129-31, 133-34; Pl. Ex. 30).

According to Bailey, he decided to terminate the plaintiff's employment based on the conduct Murgatroyd reported.  (Bailey Dep. at p. 44).  He states that he "only considered the offenses that had been made that day, and there were at least two work rules in Group C that she was in violation of."[31]  *Id*. at p. 47.  Bailey further states that Murgatroyd told him that the plaintiff "became very agitated . . . used a lot of profanity [] and [] refused to submit the reports." *Id*.  Bailey contacted Collier soon after he had made the decision to terminate the plaintiff, at

---

[30]The e-mail provides:

Rhonda says it is Humanly [sic] impossible for her to get her past weekly sales summaries caught up.  I approached her today again, and asked her about her sales summaries, she got extremely irate, and started raising her voice and getting very offensive.  Yesterday she claimed she tried to call me at 0630 in the morning to let me know she was going straight out on calls.  She claimed she could not get a hold of me and called Tim to leave a message that she was leaving her house and going straight out on calls.  Tim gave me the message and I was a little discouraged about this because my nextel [sic] is on 24 hrs a day 7 days a week.  I tried to explain to her that I need to know what she is doing especially because she is without a computer.  She claims she called again around 1330 at the office, I was not in because I went to the bank, but my cell was still on and she never called it.  The bottom line is I haven't seen any production from her, except NTA, since I have been her [sic], when I approach Rhonda about Intermarries, and summaries, she always blames her computer, she documents everything in a black book, and I noticed some of it was false today, and she got very offensive.  She claims that her computer was purged by Wilson Trucking on August 5th a [sic] notified me about this, and claims she has this written down.  That is the same day she left and went from the office and went to the doctor.  I never new [sic] she left sick until I returned to the terminal, and I didn't know about her computer problem.  On Aug 5th I meant [sic] Jeff Saunders in Heflin, AL to pickup [sic] a shipment and deliver it in my car to Bessemer, AL, and this is recorded on my expense report.  The written journal she is writing can be falsified, because there is no way to have it time dated and stamped.  She is so upset right now, and was supposed to be in a hurry to go to Tuscaloosa, but she is still in the office as of 1100 central time.  I feel uncomfortable talking to Rhonda, because of her emotional instability, and I feel that is [sic] impossible for me to talk to her without a witness around to protect myself.

(Pl. Ex. O).

[31]Under the defendant's policies and procedures, there are three categories of work violations (*i.e.*, Groups "A", "B" and "C").  (Pl. Ex. M).  Group "C" violations are the most serious and "may constitute just cause for termination without prior notice."  *Id*. at p. 4; Bailey Dep. at pp. 18-19.  Such violations include, among other things, a refusal or failure to follow a direct order of a supervisor, showing "willful disrespect or insubordination to anyone, including Supervisors, customers or co-workers," and engaging in any "conduct that is damaging to the reputation of the Company, or which directly affects the working relationship with the Company, customers or co-workers."  (Pl. Ex. M, p. 4 at ¶¶ 2-5).

which time Collier could have reversed Bailey's decision, but instead he concurred with Bailey's decision based on Murgatroyd's report.  (Bailey Dep. at pp. 48-49; Collier Dec. at ¶ 5).  Bailey testified that he made the decision to terminate the plaintiff based solely on the report by Murgatroyd.  (Bailey Dep. at pp. 44-45).  Collier testified that he did not play a role in the decision to terminate the plaintiff.  (Collier Dep. at p. 36).

Although Bailey claims he alone made the decision to terminate the plaintiff's employment, there is some dispute as to that fact.  According to Maguire, both Collier and Bailey made the decision to terminate the plaintiff and Maguire gave specific input to Collier.  (Maguire Dep. at pp. 47-48).  Still further, Maguire stated that he had a conversation with Collier in which he "report[ed] what was transpiring at that time in the Birmingham Terminal."  *Id.* at p. 50.  During that conversation, Maguire testified that he believes that he told Collier that he "felt [termination] would be an option that we should look at."  *Id.* at pp. 50-51.  Collier claims that he "did not play a role in terminating Srofe" and that he only talked to Bailey after the decision to terminate her had been made.  (Collier Dep. at pp. 36, 84-85).  However, Collier also testified that after Murgatroyd's meeting with the plaintiff, Murgatroyd first called Maguire, who subsequently called him, and he in turn called Bailey; but by the time Collier reached Bailey, Bailey had already talked with Murgatroyd about the incident.  (Collier Dep. at pp. 36-38; Magurie Dep. at pp. 50-51).

Around 12:30 p.m. on September 2, 2005, Murgatroyd received a call from Maguire in which Maguire told him that Bailey and Collier "discussed with him that we can terminate Rhonda Srofe."  (Murgatroyd Dep. at p. 115).  Bailey and Collier called Murgatroyd about ten minutes later and told him to terminate the plaintiff.  *Id.* at pp. 115-16.  They (Bailey and Collier)

14

told Murgatroyd to terminate the plaintiff for "poor work performance." *Id.* at p. 114. Further, the plaintiff testified that Murgatroyd told her that Maguire had decided to terminate her. (Srofe Dep. at p. 426).

The plaintiff was given a termination notice upon which a box was checked, indicating "poor work performance" as the reason for her termination. (Pl. Ex. L). While there was another box on the form to indicate that an employee has been terminated for "insubordination," that box was not checked on the plaintiff's notice. *Id.* Nothing prevented Murgatroyd from checking more than one category on the form. (Bailey Dep. at pp. 53-55). Bailey and Collier told Murgatroyd to "just put poor - put down poor work performance." (Murgatroyd Dep. at p. 114). The defendant asserts "the term 'poor work performance' encompassed all of [the p]laintiff's conduct that was a factor in her termination." (Bailey Dep. at pp. 50-54). The plaintiff vehemently disputed the basis for her discharge in her written comments on the notice. (Pl. Ex. L).

The plaintiff sought unemployment benefits from the Alabama Department of Industrial Relations. (Pl. Ex. EE). Her claim was opposed by the defendant. *Id.* The Administrative Hearing Officer ultimately determined that the claim was due to be paid. She determined that the "unrefuted testimony does not substantiate that the claimant's work was unsatisfactory nor that she used profanity toward a member of management. Therefore, there has been no evidence presented to substantiate an act of misconduct." (Pl. Ex. K).

## II.    STANDARD OF REVIEW

Summary judgment is to be granted only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the declarations, if any, show that there is

15

no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). The party asking for summary judgment "bears the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. Only when that burden has been met does the burden shift to the nonmoving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S. Ct. 1598, 1608, 26 L. Ed. 142 (1970).

The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of his case which he bears the ultimate burden of proof. *Celotex*, 477 U.S. at 322-23; *see* FED. R. CIV. P. 56(a)-(b). Once the moving party has met his burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by . . . affidavits, or by the depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324. The nonmoving party need not present evidence in a form necessary for admission at trial; however, the movant may not merely rest on the pleadings. *Id.*

After a motion has been responded to, the court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). Rule 56(c) mandates the entry of summary judgment against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex*, 477 U.S. at 322.

16

The substantive law will identify which facts are material and which are irrelevant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248.  "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  *Id.* at 249.  A judge's guide is the same standard necessary to direct a verdict: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Anderson*, 477 U.S. at 259; *see Bill Johnson's Restaurants, Inc. v. NLRB*, 461 U.S. 731, 745 n.11, 103 S. Ct. 2161, 76 L. Ed. 2d 277 (1983).  *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 643 (11th Cir. 1997).  However, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matusushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).

If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.  *Anderson*, 477 U.S. at 249 (citations omitted); *accord Spence v. Zimmerman*, 873 F.2d 256 (11th Cir. 1989).  Furthermore, the court must "view the evidence presented through the prism of the substantive evidentiary burden," so there must be sufficient evidence on which the jury could reasonably find for the plaintiff.  *Anderson*, 477 U.S. at 254; *Cottle v. Storer Communication, Inc.*, 849 F.2d 570, 575 (11th Cir. 1988).  Nevertheless, credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are the function of the jury, and therefore the evidence of the nonmovant is to be believed and all justifiable inferences are to be drawn in his favor.  *Anderson*, 477 U.S. at 255.  The nonmovant

17

need not be given the benefit of every inference but only of every reasonable inference. *Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988). "If reasonable minds could differ on the inferences arising from undisputed facts, then a court should deny summary judgment." *Allen*, 121 F.3d at 643.

## III.   DISCUSSION

### A.  The Parties' Positions

The plaintiff alleges in her first two claims that the defendant retaliated against her and terminated her in violation of Title VII and the ADEA because she complained about her treatment by Maguire and Murgatroyd.  (Complaint at ¶¶ 8, 15-26).  Specifically, she states that she complained to the defendant that Maguire discriminated against her and harassed her because of her gender and her age.  She undergirds her harassment and discrimination claims premised on Maguire's comments during his January visit to Birmingham and his treatment of her thereafter. More specifically, the plaintiff contends that she was "subjected to sexual and age related comments, conduct, and treatment" by her two supervisors McGuire and Murgatroyd while employed at Wilson.  *Id*. at ¶ 8.  She states that she made "multiple complaints to members of Wilson's management regarding the ongoing discrimination and harassment including a formal complaint of discrimination and harassment on August 3, 2005."  *Id*. at ¶ 10.  In addition, she asserts that the defendant retaliated against her for filing a complaint by "isolati[ng  her], refusing to provide her with basic equipment necessary for the performance of her duties, heightened work performance standards, and [an] unfounded disciplinary action."  *Id*. at ¶ 12.  Finally, as to the retaliation claims, she also states that the defendant's stated reasons for her termination are false and a pretext for the real reason behind her termination.  *Id*. at ¶ 17.  The plaintiff claims the

real reason why the defendant terminated her is because of the complaint she made regarding the discriminatory acts against her.[32]  *Id*.

The plaintiff also alleges that "[t]he defendant had knowledge of Maguire and Murgatroyd's conduct, knew or should have known that such conduct constituted illegal discrimination and harassment, and failed to take adequate steps to remedy the situation."  *Id*. at ¶¶ 29, 36 & 43.  The plaintiff further claims the defendant negligently retained McGuire and Murgatroyd by continuing their employment after the plaintiff reported their discriminatory and harassing conduct.  *Id*. at ¶ 28.  Similarly, she asserts "the defendant negligently supervised McGuire and Murgatroyd both before and after the plaintiff reported their discriminatory conduct."  *Id*. at ¶ 36.  Finally, she alleges that the defendant was negligent in its training of McGuire and Murgatroyd before and after the report of discriminatory and harassing conduct.  *Id*. at ¶ 42.  In support of the plaintiff's claims for negligent retention, supervision, and training, she asserts "the defendant ratified and/or condoned McGuire and Murgatroyd's discriminatory treatment of [her]."  *Id.* at ¶¶ 28, 35 & 42.

In response, the defendant asserts the plaintiff cannot state a *prima facie* case of retaliation because her complaint of discrimination "was not 'objectively reasonable' under the circumstances" and because there is no causal connection between the plaintiff's complaint and her subsequent discharge.  (Def. Mem. at pp. 21, 23).  In addition, the defendant asserts the plaintiff lacks evidence to support her claim that the reason for her termination was pretext.  Instead, the defendant asserts that the evidence shows it terminated the "[p]laintiff based on its good faith belief that [p]laintiff engaged in dischargeable misconduct."  *Id*. at p. 15.

---

[32]Although, the plaintiff's claims include allegations of discrimination and harassment, her only federal claims asserted in the complaint are for retaliation.  (Complaint (doc. 1) at pp. 3-4).

Concerning the negligent retention, supervision, and training claims, the defendant asserts they must fail because the plaintiff has not alleged or provided evidence of an underlying tort, an essential element of her claims. *Id*. at pp. 24-25. The defendant contends that no member of upper management had any information that Maguire or Murgatroyd engaged in any discriminatory conduct toward the plaintiff or any other employee. *Id*. at p. 25 (citing Bailey Dec. at ¶¶ 3-5; Collier Dec. at ¶ 3). In addition, the defendant asserts that it investigated the plaintiff's complaint and the investigation produced no evidence in support of misconduct. *Id.* at p. 26 (citing Bailey Dec. at ¶¶ 5-7). Finally, the defendant claims Murgatroyd and Maguire were properly trained before and during their employment with Wilson. *Id.* (citing Maguire Dec. at ¶ 12; Murgatroyd Dec. at ¶ 3; Murgatroyd Dep. at pp. 65-68).

### B.   Retaliation Claims Under Title VII and ADEA

#### 1.   The Law

Both parties acknowledge that the burden-shifting framework of *McDonnell Douglas* is applicable to the retaliation claims in the present case. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973); *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981); (Def. Mem. at p. 14); (Pl. Res. Opp. at p. 21).[33] In *Burdine*, the Supreme Court set out the burden-shifting framework for Title VII cases alleging discriminatory treatment:

> "First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the *prima facie* case, the burden shifts to the defendant 'to articulate some legitimate, nondiscriminatory reason for the employee's rejection.' Third, should the defendant carry this burden, the plaintiff must then have an opportunity to

---

[33]"The Eleventh Circuit has adapted to issues of age discrimination the principles of law applicable to cases arising under the very similar provisions of Title VII." *Hairston v. Gainesville Sun Publ'g Co.*, 9 F.3d 913, 919 (11th Cir. 1993).

prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination."

*Burdine*, 450 U.S. 248, 252-53 (citing *McDonnell Douglas*, 411 U.S. at 802, 804).

Title VII and the ADEA retaliation provisions prevent an employer from retaliating against an employee for enforcing her rights. *See Cotton v. Cracker Barrel Old Country Store, Inc.*, 434 F.3d 1227, 1233 (11th Cir. 2006). They make it unlawful for an employer to discriminate against the employee because she has opposed any unlawful practice or because she has made a charge or participated in any investigation, proceeding, or hearing involving an unlawful employment practice. *Id*. These statutes further protect an employee from a wider range of conduct than the discrimination provisions themselves. *See Phelan v. Cook County* 463 F.3d 773, 781 n.3 (6th Cir. 2006). In order for the plaintiff to prove a *prima facie* case of retaliation under Title VII or the ADEA, she must establish "(1) that she engaged in statutorily protected expression; (2) that she suffered an adverse employment action; and (3) that there is some causal realtion between the two events." *McCann v. Tillman*, 526 F.3d 1370, 1375 (11th Cir. 2008) (citing *Cooper v. Southern Co.*, 390 F.3d 695, 740 (11th Cir. 2004)); *Weeks v. Harden Mfg. Corp.*, 291 F.3d 1307, 1311 (11th Cir. 2002) (citing *Pipkins v. City of Temple Terrace, Fla.*, 267 F.3d 1197, 1201 (11th Cir. 2001)); *Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1260 (11th Cir. 2001); *Wideman v. Wal-Mart Stores, Inc.*, 141 F.3d 1453, 1454 (11th Cir. 1998)).

### 2.    Analysis

The defendant contends the plaintiff fails to meet the first element of her *prima facie* case because she did not engage in a "protected activity" under Title VII or the ADEA since her complaint was not subjectively or objectively reasonable. (Def. Mem. at pp. 19-23). Srofe argues her internal complaint to Bailey clearly establishes the "protected expression" prong of

21

her claim.  (Pl. Res. Opp. at pp. 23-24.).  *See Holified v. Reno*, 115 F.3d 1555 (11th Cir. 1997)

(finding complaints made to superiors regarding racial discrimination were a protected

expression).  The plaintiff further contends she must only show she "**had a reasonable good**

**faith belief that the discrimination existed**."  (Pl. Res. Opp. at p. 25 (bold in original) (quoting

*Meeks v. Computer Assoc. Intern.*, 15 F.3d 1013, 1021 (11th Cir. 1994) and (citing *Jackson v.*

*Birmingham Bd. of Educ.*, 544 U.S. 167, 187-88 & n.1, 125 S. Ct. 1497, 161 L Ed. 2d 361 (2005)

(Thomas, J., dissenting) (noting "no Court of Appeals requires a complainant to show more than

that he had a reasonable, good-faith belief that discrimination occurred to prevail on a retaliation

claim.")).  The plaintiff next argues she was entitled to protection "if she believe[d] she [was]

being discriminated against" whether or not Wilson's conduct was unlawful.  (Pl. Res. Opp. at p.

25 (citing *Swanson v. Civil Air Patrol*, 37 F. Supp. 2d 1312, 1325 (M.D. Ala. 1998)).  Finally,

she states that the "objectiveness of whether [her] complaints had merit or were reasonable is for

the jury to decide."  (Pl. Res. Opp. at p. 26 (citing *Lipphardt v. Durango Steakhouse of Brandon,*

*Inc.*, 267 F.3d 1183 (11th Cir. 2001)).

In order to establish the first element of a retaliation claim, "a plaintiff must show that

she 'had a good faith, reasonable belief that the employer was engaged in unlawful employment

practices.'"  *Weeks v. Harden Mfg. Corp.*, 291 F.3d 1307, 1311-12 (11th Cir. 2002) (quoting

*Little v. United Tech., Carrier Transicold Div.*, 103 F.3d 956, 960 (11th Cir. 1997)).  This

requires that the plaintiff demonstrate both a subjective belief that her employer engaged in

unlawful employment practices, and that the belief, even if mistaken, was *objectively* reasonable.

*Weeks*, 291 F.3d at 1312.

> "It thus is not enough for a plaintiff to allege that [her] belief in this regard was
> honest and bona fide; the allegations and record must also indicate that the belief,

22

though perhaps mistaken, was objectively reasonable." *Id.*  The reasonableness of the employee's belief is measured against existing substantive law.  *See Clover v. Total System Services*, Inc., 176 F.3d 1346, 1351 (11th Cir. 1999).  No actual unlawfulness is required but the opposed conduct "must be close enough [to unlawful] to support an objectively reasonable belief that it is." *Id.*

*Van Portfliet v. H&R Block Mortgage Corp.*, 2008 WL 3864439 (11th Cir. August 21, 2008) (unpublished); *see also Saffold v. Special Counsel, Inc.*, 147 Fed. Appx. 949, 951 (11th Cir. 2005) (unpublished) (*citing Weeks*, 291 F.3d at 1312).

The court finds the plaintiff subjectively made a good faith complaint.  In her internal complaint, the plaintiff explained that comments made to her by Maguire about her age made her feel uncomfortable.  (Pl. Ex. H).  In addition, Bailey testified that he felt that the plaintiff believed she was making a good faith complaint.  (Bailey Dep. at pp. 62 & 69).

The defendant argues, however, that the plaintiff's "belief of discrimination . . . clearly was not 'objectively reasonable' under the circumstances."  (Def. Mem. at p. 21).  The defendant lists several reasons why the plaintiff's complaint of discrimination is not objectively reasonable, including how it is limited to Maguire and the fact that the plaintiff admits "Maguire never used profanity, sexually derogatory language, or said anything mean-spirited to Plaintiff." *Id.* (citing Srofe Dep. at pp. 449-50, 453).  In addition, the defendant claims the plaintiff's complaint was "motivated by anger and vindictiveness towards Maguire because of the verbal warning she had just received" as evidenced by the fact that the compliant relates to comments made seven months earlier and the seeking of legal advice to keep her job. *Id.* (citing Srofe Dep. at pp. 154-56).  Finally, the defendant argues "the plaintiff's complaint offers no evidence of any statements or conduct by Mr. Maguire based on her sex, and the single remark by Mr. Maguire in January 2005 to 'guess his age' does not reasonably suggest any age related hostility towards Plaintiff."

(Def. Mem. at p. 22).  In sum, the defendant argues the plaintiff's complaint was not objectively

reasonable because it is based on unsupported speculation.  *Id*. at p. 23.

    The plaintiff's internal complaint to Bailey states as follows:

>     After many months of deliberation, I am compelled to contact you regarding recurrent incidents that I can only describe as harassment and discrimination involving Donald Maguire, Regional Sales Mgr [sic] based in Atlanta and other management personnel employed by Wilson Trucking.  Don has made several defamatory comments directly to me and to other Wilson employees about me regarding my work ethic and my competence as a professional sales representative.  These offensive comments began virtually during our first joint sales calls.  One especially offensive comment was made by Don regarding my age when driving to a scheduled appointment with [a] customer.  Only a few hours prior to this situation, he continuously pressured me to guess his age which waiting in the lobby for a current Wilson customer.  After repeatedly declining to guess his age, he became visibly aggravated that I would not participate in what I considered an awkward and very unprofessional discussion.  After many years as a successful sales representative, I have never been subjected to this form of harassment from any former sales or terminal managers [sic].  This is just one of many direct comments made to me and about me by Donald Maguire.

>     . . . .

>     Mr. Bailey, I am writing this letter to advise you that I believe hat Don Maguire is unjustly discriminating and harassing me based on the fact that I am an articulate, female sales professional who has a proven history of success and performance.  After receiving a verbal correction from Keith Murgatroyd on Wednesday, 7-27-05, I initialed and document per his request even though I adamantly disagreed with the reasons stated in the verbal correction form.  Less than 24 hours later on 7-28 at 8:32 a.m., I received an e-mail from Don Maguire with essentially the same reprimand content presented to m[e] by Keith Murgatroyd the day before.

>     . . . I do not feel that I will be afforded fair and unbiased treatment from the management of Region II.  I am hopeful that my frank and sincere comments in this letter may help to improve my current situation at Wilson with Don Maguire and other Wilson management personnel.

(Ex. P at pp. 1-2).

    The plaintiff's internal complaint asserts that she was discriminated against and harassed

because of her age and gender.  To demonstrate an objectively reasonable belief that she was

being discriminated against, the plaintiff's complaint must be evaluated against applicable

substantive law that required that she show (1) that she was a member of a protected class,

(2) that she was qualified for the job, (3) that she suffered an adverse employment action, and

(4) that she was displaced by or treated less favorably than someone outside the protected class.

*Webb-Edwards v. Orange County Sheriff's Office*, 525 F.3d 1013, 1031 (11th Cir. 2008) (citing

*Hinson v. Clinch County, Ga. Bd. of Educ.*, 231 F.3d 821, 828 (11th Cir. 2000) (gender

discrimination); *Chapman v. A1 Transport*, 229 F.3d 1012, 1024 (11th Cir. 2000) (en banc)

(age); *Munoz v. Oceanside Resorts, Inc.*, 223 F.3d 1340, 1346 (11th Cir. 2000) (age); *Damon v.

Fleming Supermarkets of Fla.*, 196 F.3d 1354, 1359 (11th Cir. 1999) (age); *Bogle v. Orange

County Bd. of County Comm'rs,* 162 F.3d 653, 656-57 (11th Cir. 1998) (age).

> The Supreme Court has defined an adverse employment action as follows:
> "A tangible employment action constitutes significant change in employment
> status such as hiring, firing, failing to promote, reassignment with significantly
> different responsibilities or a decision causing a significant change in benefits."
> *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761, 118 S. Ct. 2257, 141 L. Ed.
> 2d 633 (1998).  This Court held in *Davis v. Town of Lake Park Fla.*, 245 F.3d
> 1232, 1238 (11th Cir. 2001), that "not all conduct by an employer negatively
> affecting an employee constitutes adverse employment action."  This Court also
> held in *Davis* that:
>
> > to prove adverse employment action in a case under Title VII's
> > anti-discrimination clause, an employee must show a serious and
> > material change in the terms, conditions, or privileges of
> > employment.  Moreover, the employee's subjective view of the
> > significant adversity of the employer's action is not controlling; the
> > employment action must be materially adverse as viewed by a
> > reasonable person in the circumstances.
>
> *Id*. at 1239.

*Webb-Edwards*, 525 F.3d at 1031.

To establish an objectively reasonable belief that she was being unlawfully harassed, the plaintiff must show (1) that she belongs to a protected group; (2) that she has been subject to unwelcome harassment;  (3) that the harassment must have been based on a protected characteristic of the employee; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) that the employer is responsible for such environment under either a theory of vicarious or of direct liability.  *Webb-Edwards*, 525 F.3d at 1027 (sexual harassment); *see also Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002) (national origin); *Weeks v. Harden Mfg. Corp.*, 291 F.3d 1307, 131 (11th Cir. 2002) (age and gender); *Smithers v. Wynne*, 2008 WL 53245 (11th Cir. January 4, 2008) (age and gender).  "A hostile work environment claim under Title VII [or the ADEA] is established upon proof that 'the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'"  *Miller*, 277 F.3d at 1275.  "In evaluating the objective severity of the harassment, the [court] must consider, among other factors: (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance."  *Id*. at 1276; *Satchel v. School Bd. of Hillsborough County*, 251 Fed. Appx. 626, 630 (11th Cir. 2007) (unpublished).  Moreover, "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment."  *Faragher v. City of Boca Raton*, 524 U.S. 775, 788, 118 S. Ct. 2275, 2283, 141 L. Ed. 2d 662 (1998) (citation omitted); *see also Apodaca v. Secretary of Dept*

*of Homeland Sec.*, 161 Fed. Appx. 897, 901 (11th Cir. 2006) (unpublished).  "A hostile work

environment claim under Title VII is established upon proof that the workplace is permeated

with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to

alter the conditions of the victim's employment and create an abusive working environment."

*Miller*, 277 F.3d at 1275.  Title VII is not meant to serve as "a general civility code."  *See Oncale*

*v. Sundowner Offshore Servs., Inc*., 523 U.S. 75, 81, 118 S. Ct. 998, 1002, 140 L. Ed. 2d 201

(1998).  The fourth element-that the harassment altered the terms and conditions of

employment-contains both a subjective and an objective component.  *Mendoza v. Borden, Inc*.,

195 F.3d 1238, 1246 (11th Cir. 1999).  Thus, to satisfy this element, the employee must show

that she subjectively perceived the harassment as severe and pervasive enough to change the

terms or conditions of employment and present facts sufficient for the court to find that this

perception was objectively reasonable.  *Id*.

     Srofe argues that a jury should determine whether her complaint was objectively

reasonable.  She relies on *Lipphardt v. Durango Steakhouse of Brandon, Inc.*, in support of her

position.  267 F.3d 1183, 1189 (11th Cir. 2001).  *Lipphardt* involved a female employee who

previously was involved in a relationship with her supervisor.  *Id.* at 1185.  Lipphardt ended her

relationship with the supervisor while they both were still employees of Durango.  *Id*.  However,

the supervisor continued to pursue the relationship and, among other things, "brushed up against

her" in a sexual way, "threatened to hurt her or her child," "blocked her exit," and "followed her

to her car."  *Id*.  After trial, the judge granted Durango's motion for judgment as a matter of law

"because Lipphardt had 'not demonstrated an objectively reasonable belief that the conduct

complained of constituted harassment based on gender, or that the conduct she opposed was

'close enough' to support an objectively reasonable belief that it was sexual harassment." *Id.* at 1187-88.  The Eleventh Circuit reversed the holding of the trial judge, finding that "[o]n a claim for retaliation, the standard is not whether there is a valid hostile work environment claim, but whether [the plaintiff] had a good-faith reasonable belief that she was the victim of such harassment." *Id.* at 1188.  The court also noted that there was no error in the jury's conclusion that "Lipphardt objectively believed that Knuth was harassing her based on her gender." *Id*.  Finally, the court noted the plaintiff's belief must be "*objectively* reasonable in light of the facts and record presented." *Id*. at 1187 (citing *Little*, 103 F.3d at 960).

The plaintiff can establish the reasonableness of her internal complaints of discrimination and harassment through direct evidence of discriminatory intent, such as age or gender biased statements, through circumstantial evidence, or through statistical evidence.  *See Zaben v. Air Products & Chemicals, Inc.*, 129 F.3d 1453, 1457 (11th Cir. 1997) (citations omitted).  In the present case, the plaintiff has not presented any direct evidence of age discrimination or a statistical pattern of discrimination.  Instead, she has relies on circumstantial evidence.  Specifically, she asserts that  Maguire made an "especially offensive comment . . . regarding my age" and "continuously pressured me to guess his age."  (Pl. Ex. P at p. 1).  She also stated that about the same time, "Maguire told her she was 'seasoned' and made comments about her age." (Pl. Res. at p. 7).

The court finds, however, that this evidence is insufficient as a matter of law to support her retaliation claim to the extent it is premised on allegations of gender and age discrimination. The court concludes that reasonable jurors could not find that the plaintiff's complaints of discrimination were objectively reasonable under the circumstances.  In her internal complaint,

she notified Bailey that she "believe[d] that [] Maguire [was] unjustly discriminating and harassing [her] based on the fact that [she is] an articulate, female." (Pl. Ex. P). She also claimed that "she [was] being Gender Harassed by Maguire because she is a strong woman that does not bow to him." (Pl. Ex. H). The defendant argues the plaintiff "offers no evidence of any statements or conduct by Mr. Maguire based on sex." The court finds no evidence of gender discrimination in the record other than the plaintiff's speculation and conjecture, which is insufficient to avoid summary judgment. *See, e.g., Blackstone v. Shook and Fletcher Insulation Co.*, 764 F.2d 1480, 1482 (11th Cir. 1985) ("All reasonable inferences arising from the undisputed facts should be made in favor of the nonmovant, but an inference based on speculation and conjecture is not reasonable.") (citation omitted). Therefore, the court further finds the plaintiff has not met the first element of her retaliation claim to the extent it is premised on a complaint of gender discrimination.

To the extent that the plaintiff's retaliation claim is premised on purported age discrimination, the court similarly finds it to be insufficient. The plaintiff's age discrimination complaints are only undergirded by Maguire's comments in January 2005 when he wanted her to "guess his age" and (Pl. Ex. H ("Plaintiff's Interview") at p. 1) and when he made a comment about the plaintiff being "seasoned" (Pl. Dep. at pp. 439-40, 447-48). These are insufficient as a matter of law to support the first element of her retaliation claim. They do not sufficiently evidence discriminatory animus for this court to find that they are "close enough . . . to support an objectively reasonable belief" of unlawful conduct. *Clover*, 176 F.3d at 1351. Additionally, the court also finds that at the time of the internal complaint, the plaintiff had not suffered any adverse employment action to support a reasonable belief that the defendant had acted in an

29

unreasonable manner.

To the extent that the plaintiff premises her internal complaints on alleged harassment, the court also finds them insufficient to set for a *prima facie* case of retaliation.  First, as to any claim that the alleged harassment was "because of sex," the record is devoid of evidence, other than speculation, to support such a proposition.  Thus, it is insufficient.  Second, the record demonstrates that any harassment did not come close to amounting to a hostile work environment that would be actionable under either Title VII or the ADEA.  The relevant comments are simply insufficient to overcome the motion for summary judgment.  The purportedly age related comments were isolated to the January 2005 visit by Maguire, they were not particularly severe, and they were not physically threatening or humiliating.  This isolated incident, while inappropriate and not to be condoned, is not sufficient to meet the first element of the *prima facie* case.  Accordingly, these allegations are legally insufficient to support the plaintiff's retaliation claim.

**B.     NEGLIGENCE CLAIMS**

The plaintiff also asserts that Wilson negligently retained, supervised, and trained Maguire and Murgatroyd.  These claims are premised on purported the "illegal discrimination and harassment" alleged in this matter.  (Complaint at ¶¶ 29, 36 & 43).  The defendant contends that summary judgment is due to be granted it on said claims because the case law in Alabama does not recognize sex or age discrimination or harassment as a underlying tort to support such claims.  (Def. Mem. at p. 25).  The plaintiff retorts that because the defendant knew of the repeated acts of carelessness and incompetency by Maguire and Murgatroyd, it is a matter for the jury to determine.  (Pl. Mem. at p. 35).

To establish a claim against the defendant for negligent training, supervision, and/or retention, the plaintiff must show that the allegedly incompetent employee committed a common law tort.  *Thrasher v. Ivan Leonard Chevrolet, Inc*., 195 F. Supp. 2d 1314,1320 (N.D. Ala. 2002); *see also Jackson v. Cintas Corp*., 391 F. Supp. 2d 1075, 1100 (M.D. Ala. 2005) (negligent supervision claim).  It simply is not enough to allege that the offending employees engaged in age or gender discrimination or harassment.  *See Thrasher*, 195 F. Supp. at 1320.  Similarly, the courts have held that an employer cannot be held liable on a failure to investigate theory in the absence of "independent proof of wrongful conduct of an [offending] employee."  *Stevenson v. Precision Standard, Inc*., 762 So. 2d 820, 825 (Ala. 2000); *see also Mardis v. Robbins Tire & Rubber Company*, 669 So. 2d 885, 889 (Ala. 1995) (holding that to demonstrate a claim for negligence, it must be demonstrated that had the master exercised due and proper diligence, the master would have learned of the incompetency); *Evans v. Mobile Infirmary Medical Center*, 2005 WL 1840235 (S.D. Ala. Aug. 2, 2005) (holding that to establish a prima facie case of negligent hiring, training, supervision or retention, the plaintiff must, *inter alia*, affirmatively show that had the master exercised due and proper diligence, the master would have learned of the incompetency).

The plaintiff's negligence claims are premised on the allegedly discriminatory and harassing conduct of Maguire and Murgatroyd which the court has found to be insufficient to support her retaliation claim.  The plaintiff has not demonstrated that the underlying discrimination or harassment that she alleges in support of the retaliation claim is actionable.  Accordingly, the defendant's motion for summary judgment is due to be granted on these claims as well.  Even if the evidence of discrimination were sufficient, the motion would still be due to

31

be granted as the plaintiff has not shown that the allegedly incompetent employee committed a common law tort.  *Thrasher*, 195 F. Supp. 2d at 1320.

## IV.   CONCLUSION

Premised on the foregoing, the defendant's motion for summary judgment (doc. 19) is due to be granted.  An appropriate order will be entered.

**DATED**, this the 15th day of December, 2008.

*John E. Ott*

**JOHN E. OTT**
United States Magistrate Judge